SH

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Jennifer Power, individually and on behalf of the statutory beneficiaries of Monnie Washburn, Deceased; Estate of Monnie Washburn | No.  CV 19-01546-PHX-DLR (MHB) |
| Plaintiff, | **ORDER** |
| v. | |
| State of Arizona, et al., | |
| Defendants. | |

Plaintiff Jennifer Power, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona state law.  (Doc. 1-3 at 98–119.) Defendants move for summary judgment (Docs. 157, 158, 160, 163), and Plaintiff opposes (Docs. 169, 172, 174, 179).

**I.    Background**

Plaintiff filed her First Amended Complaint in Maricopa County Superior Court, and Defendants subsequently removed the case to this Court.  (Doc. 1-3 at 99–119 (First Amended Complaint ("FAC")).)  Plaintiff is the duly appointed personal representative of her husband, Monnie Washburn's, estate.  (*Id.* ¶ 2).)  Mr. Washburn died on June 20, 2017 while he was incarcerated within the Arizona Department of Corrections (ADC).  (*Id.* ¶ 4.) In the FAC, Plaintiff sues the State of Arizona; private contractors Corizon Health, Inc.,[1]

---

[1] Plaintiff has named as Defendants Corizon Incorporated, Corizon LLC, and Corizon Health Incorporated.  Because these reference the same entity, the Court will refer to the Defendant collectively as "Corizon" in this Order.

1  Correct Care Solutions ("Correct Care"), and GEO Group; Corrections Officers (CO) Dale

2  King and Antonio Tuccino; and Corrections Sergeant Steven Gallardo.

3  In the FAC, Plaintiff alleges that on June 20, 2017, Mr. Washburn was being

4  transported, via prison bus, from the Arizona State Prison Complex (ASPC)-Kingman to

5  the ASPC-Tucson.  (*Id.* ¶ 44.)  The air conditioner in the prison bus was not working, and

6  as a result of the prescription drugs Mr. Washburn had been prescribed by Corizon and/or

7  Correct Care, which placed him at risk of hyperthermia, Mr. Washburn suffered a seizure

8  and died.  (*Id.* ¶¶ 38, 45, 77.)

9  In Count One, Plaintiff brings a state law negligence claim against Defendants State

10  of Arizona, Corizon, GEO Group, and Correct Care for their failure to provide safe

11  transport for Mr. Washburn and failing to tend to his medical needs.  (*Id.* ¶¶ 90–102.)  In

12  Count Two, Plaintiff brings a medical negligence claim against Corizon and Correct Care

13  for failing to mitigate the risks caused by Mr. Washburn's prescription medications and

14  failing to properly respond to his medical emergency during transport.  (*Id.* ¶¶ 103–110.)

15  In Counts Three and Four, Plaintiff brings Eighth Amendment medical care claims against

16  Defendants Corizon, Tuccino, King, and Gallardo for their failure to respond to Mr.

17  Washburn's medical emergency during transport.  (*Id.* ¶¶ 111–138.)  In Count Five,

18  Plaintiff asserts a survival action against all Defendants.  (*Id.* ¶¶ 139–141.)

19  **II.  Summary Judgment Standard**

20  A court must grant summary judgment "if the movant shows that there is no genuine

21  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

22  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The

23  movant bears the initial responsibility of presenting the basis for its motion and identifying

24  those portions of the record, together with affidavits, if any, that it believes demonstrate

25  the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

26  If the movant fails to carry its initial burden of production, the nonmovant need not

27  produce anything.  *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099,

28  1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts

1   to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

2   contention is material, i.e., a fact that might affect the outcome of the suit under the

3   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

4   jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

5   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

6   Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

7   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

8   it must "come forward with specific facts showing that there is a genuine issue for trial."

9   *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

10  citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

11          At summary judgment, the judge's function is not to weigh the evidence and

12  determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

13  477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

14  all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

15  materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

16  **III.   Facts**[2]

17          ASPC-Kingman is a privately-operated state prison in the ADC system.  (Doc. 159

18  ¶ 2.)  In June 2017, Defendant GEO Group was the vendor that the State contracted to run

19  ASPC- Kingman.  (*Id.*)  In turn, GEO Group subcontracted Defendant Correct Care to

20  provide medical and mental-health care to the prisoners housed at ASPC-Kingman.  (*Id.*)

21

_____

22          [2] Defendants King and Tuccino proffered a copy of the Confidential Report

23  completed by the ADC Inspector General's Office Administrative Investigations Unit
    (AIU) regarding the events of June 20, 2017.  (Doc. 159-1, *Defs. King and Tuccino's Ex.*

24  *1*).  The report is not admissible evidence.  There is no accompanying verification by the
    custodian of records, and the report is essentially a summary of King and Tuccino's

25  statements that they relayed to the author of the report, AIU Investigator Erica Waldridge.
    Material in a form not admissible in evidence, but which could be produced in a form

26  admissible at trial, may be used to *avoid*, but not *obtain* summary judgment.  *See Quanta*
    *Indemnity Co. v. Amberwood Dev. Inc.*, No. CV 11-1807-PHX-JAT, 2014 WL 1246144,

27  at *2 (D. Ariz. March 26, 2014) (citing cases).  As such, the report is hearsay and cannot
    be used to obtain summary judgment.  *See id.* ("Because verdicts cannot rest on

28  inadmissible evidence and a grant of summary judgment is a determination on the merits
    of the case, it follows that the *moving* party's affidavits must be free from hearsay.")
    (internal quotation omitted) (emphasis in original).

1    Corizon Health was the vendor that the State contracted to provide medical and mental-

2    health care to prisoners in state-run prison facilities, such as ASPC-Tucson.  (*Id.*)  The

3    private prison, ASPC-Kingman, and state-operated prison, ASPC-Tucson, did not utilize a

4    shared electronic healthcare database but rather GEO Group/Correct Care maintained hard-

5    copy patient records while Corizon maintained digital patient records without either having

6    shared electronic record access.  (Doc. 161 ¶ 7.)

7         On June 20, 2017 Defendants CO II's Tuccino and King signed up for a roundtrip

8    prisoner transport between ASPC-Kingman and ASPC-Tucson.  (Doc. 159-2 at 17

9    (Tuccino Depo. at 64:24–25); Doc. 159-3 at 4 (King Depo. at 9:3–13).)  Before departing

10   Tucson for Kingman, King and Tuccino completed the pre-trip inspection and loaded 38

11   prisoners into the bus.  (Doc. 159-2 at 18 (Tuccino Depo. at 65:1–68:1).)

12        The bus departed from Tucson at approximately 4:30 a.m., with Defendant Tuccino

13   driving and Defendant King as the passenger.  (*Id.* (Tuccino Depo. at 68:6–69:2).)  The

14   passenger was responsible for supervising the prisoners and performing welfare checks.

15   (*Id.* at 19 (Tuccino Depo. at 69:3–8).)  When conducting a welfare check, the passenger

16   looks through the plexiglass barrier that separates the driver and passenger from the

17   prisoners; officers generally are not allowed to access the prisoner compartment without

18   first getting permission.  (*Id.* (Tuccino Depo. at 70:17–72:19).)  On the day of the transport,

19   the temperature in Tucson hit 116 degrees, and the Phoenix area experienced record heat

20   of 119 degrees.  (Doc. 161 ¶ 8.)

21        When the prison bus got to Wickenburg, the officers switched positions, and

22   Defendant Tuccino took over as passenger while Defendant King drove.  (Doc. 159-2 at

23   20 (Tuccino Depo. at 74:9–24).)

24        The bus arrived in Kingman at approximately 10:00 a.m.  (*Id.* at 21 (Tuccino Depo.

25   at 77:1–3).)  After they finished unloading the first group of prisoners and loading the

26   second group of prisoners who were being transported back to Tucson, Defendant Tuccino

27   noticed that the inside of the bus felt "a little hot," and he informed the prisoners that there

28   was water and cups for them in the back of the bus.  (*Id.* (Tuccino Depo. at 80:19–23).)

According to Defendant Tuccino, the air conditioner was on, but it was not blowing as cold as it was on the first leg of the trip.  (*Id.* at 22, 66 (Tuccino Depo. at 81:7–14, 259:12–20).)  They departed Kingman for Tucson at approximately 1:00 p.m.  (Doc. 159 ¶ 11.)

Prisoner Michael Ballantyne was one of the prisoners onboard the bus during the return trip to Tucson.  (Doc. 173 ¶ 1.)  Upon boarding the bus, Ballantyne noticed that it was hot inside the bus.  (*Id.* ¶ 13.)  Either Defendant King or Defendant Tuccino told the prisoners, "The air is already on, so don't even cry about it."  (*Id.*)

At some point after leaving the Kingman facility, the prisoners began to complain about the heat inside the bus.  (Doc. 159-3 at 4 (King Depo. at 11:2–7); Doc. 173 ¶ 17).)  Defendant King noticed that the air conditioner was blowing air, but it was not blowing as cool as it was during the trip to Kingman.  (*Id.* at 37 (King Depo. at 143:15–25).)  Also around this time, Defendant King informed Defendant Tuccino that Mr. Washburn was pacing back and forth, asking for water, and pulling at his restraints; Defendant King believed the other prisoners were egging Mr. Washburn on and ordered Mr. Washburn to sit down, and Defendants discussed using pepper spray if Mr. Washburn kept trying pulling at his restraints.  (Doc. 159-2 at 22 (Tuccino Depo. at 82:5–84:9); Doc. 159-3 at 6 (King Depo. at 19:1–4).)  Ballantyne observed that Mr. Washburn complained about the heat at the beginning of the transport, but Mr. Washburn "was otherwise normal."  (Doc. 173 ¶ 22.)

At some point during the trip back to Tucson, the temperature light came on as the bus was going up a hill, and Defendant Tuccino, who was driving at this time, downshifted and reduced his speed to between 25 and 30 miles per hour.  (Doc. 159-2 at 24, 66 (Tuccino Depo. at 90:15–91:9, 258:1–4).)  Tuccino pulled over for a couple of minutes so that traffic could pass.  (*Id.* at 24 (Tuccino Depo. at 91:18–92:11).)  The temperature light eventually turned off.  (*Id.* at 25 (Tuccino Depo. at 93:5–8).)

On the return trip in Wickenburg, the officers switched places, and Defendant Tuccino took over as passenger again.  (*Id.* at 26 (Tuccino Depo. at 98:12–14).)  The prisoners were still complaining about the heat, so Defendant King went inside a Filiberto's

1    restaurant and replenished the ice and water in the Igloo cooler while Tuccino waited in
2    the bus with the prisoners.  (*Id.* at 26 (Tuccino Depo. at 98:18–100:15); Doc. 159-3 at 24
3    (King Depo. at 91:16–25).)  The lock on the side door of the prison bus was not working,
4    so King and Tuccino had to breach the prisoner compartment of the bus in order to get the
5    Igloo cooler on and off the bus; they did not inform Central Office that the prisoner
6    compartment was being breached.  (Doc. 159-2 at 26 (Tuccino Depo. at 99:14–100:19).)
7    Defendant King observed Mr. Washburn while he was getting the Igloo cooler out of the
8    bus, and Mr. Washburn appeared to be okay to Defendant King.  (*Id.* at 28 (King Depo. at
9    12:2–8).)  The officers lowered the bus windows to get more air circulating in the bus.
10   (Doc. 162 ¶ 19.)

11         In Wickenburg, Ballantyne observed that Mr. Washburn was red and sweaty and
12   saying random things that made no sense, and Ballantyne asked the officers to get help for
13   Mr. Washburn, but the officers refused.  (Doc. 173 ¶¶ 42–43, 46, 57–58.)  Ballantyne
14   asserts that Mr. Washburn was having convulsions, "flopping around like a fish," and
15   choking on his own vomit between Wickenburg and Phoenix.  (Doc. 173 ¶¶ 75–76.)

16         As they were about to depart Wickenburg, some of the prisoners informed Tuccino
17   that Mr. Washburn had a seizure, so Tuccino got up and observed Mr. Washburn through
18   the plexiglass barrier, and it did not appear to Tuccino that Mr. Washburn was having a
19   seizure; Tuccino called his supervisor, Defendant Gallardo and informed him of the
20   situation.  (Doc. 159-2 at 28, 61 (Tuccino Depo. at 105:23:–106:19, 240:1–8).)  Gallardo
21   asked Tuccino if he had witnessed a seizure, to which Tuccino responded that he had not;
22   Tuccino informed Gallardo that Mr. Washburn was "just sitting there" and that he was still
23   breathing.  (*Id.* at 28 (Tuccino Depo. at 107:3–10).)  Tuccino asked Gallardo if he should
24   initiate an Incident Command System (ICS), and Gallardo told him not to; Gallardo
25   instructed Tuccino not to pull over or "pop the compartment" and to continue on to Tucson.
26   (*Id.* (Tuccino Depo. at 107:11–108:18).)  Under department policy, an ICS is required when
27   there is a "medical emergency."  (*Id.* at 63 (Tuccino Depo. at 248:5–10).)  Prisoners are
28   not permitted to render medical aid to other prisoners.  (Doc. 162 ¶ 24.)

Mr. Washburn vomited approximately 10 to 15 minutes after the initial phone call between Defendants Tuccino and Gallardo.  (Doc. 159-2 at 28–29 (Tuccino Depo. at 108:23–109:4).)  Tuccino called Gallardo back and reported that he had witnessed Mr. Washburn vomiting; Tuccino told Gallardo that he would like to get Mr. Washburn off the bus, initiate an ICS, and transport Mr. Washburn to ASPC-Perryville, which was the closest facility, but Gallardo advised that he would "make the plans" and call Tuccino back.  (*Id.* at 29–30 (Tuccino Depo. at 109:11–16, 113:4–9).)

After speaking with Defendant Tuccino, Defendant Gallardo contacted Corizon employee Nurse Nidia Salazar at ASPC-Tucson around 5:00 p.m. and relayed what Tuccino told him, specifically that a prisoner had vomited and was not feeling well; he did not mention a seizure to Nurse Salazar.  (Doc. 162 ¶ 26; Doc. 161 ¶ 15.)  Nurse Salazar noted that Gallardo told her a prisoner was feeling ill and had vomited; Nurse Salazar told Gallardo that she did not know what they should do and offered to speak to a provider to find out what he should do to care for the prisoner.  (Doc. 162 ¶ 27.)  Nurse Salazar consulted with the on-duty provider, Nurse Practitioner (NP) Leo Easley, who told her she could admit the Mr. Washburn to the medical unit upon arrival at ASPC-Tucson.  (*Id.* ¶ 28.)  Nurse Salazar and NP Easley concluded that Mr. Washburn was likely dehydrated because he was vomiting, felt ill, and it was common in June for prisoners to become dehydrated.  (*Id.*)

After Nurse Salazar spoke with NP Easley, Defendant Gallardo called back and asked Nurse Salazar if he should seek medical attention for Mr. Washburn, noting that the transport bus was about three hours away, and Nurse Salazar told Gallardo, "No. Bring him in. And I will reserve a bed at housing at Nine … And we'll get the orders set up or get it ordered that as soon as he gets here, we'll get him over there and get IVs in him, to rehydrate him."  (*Id.* ¶ 31.)  Nurse Salazar also indicated that Mr. Washburn "should be fine" for the three hours remaining in the drive to Tucson.  (Doc. 171 ¶ 26.)  Nurse Salazar testified that she had not received training on how to handle medical issues that arise during inbound medical transports.  (*Id.* ¶ 30.)  NP Easley testified that he is unsure whether he

was authorized under Corizon policy to instruct the transport officers to divert the transport bus.  (*Id.* ¶ 31.)  When asked whether Corizon had a policy for addressing medical issues that arise during transports, William Carr, Corizon's former vice president of operations, testified that he was "not aware" and that he was not familiar with the policies and procedures regarding medical treatment during prisoner transports.  (*Id.* ¶¶ 32–33.)

When Defendant Gallardo called Defendant Tuccino back, he informed Defendant Tuccino that he had spoken with a nurse at ASPC-Tucson, who in turn had spoken to the on-call provider; the nurse and the provider decided that Mr. Washburn was probably dehydrated and did not need to be taken to Perryville and informed Gallardo that a bed would be ready for Mr. Washburn in the ASPC-Tucson medical unit.  (Doc. 159-2 at 31 (Tuccino Depo. at 117:5–9); Doc. 162 ¶ 32.)  At this point, the bus was still two to three hours from Tucson.  (Doc. 159-2 at 31 (Tuccino Depo. at 117:10–12).)

As the bus approached Phoenix, Defendant Tuccino attempted to ask Mr. Washburn how he was doing, but Mr. Washburn did not respond.  (Doc. 159-2 at 33 (Tuccino Depo. at 127:1-8).)  Defendant Tuccino witnessed Mr. Washburn vomit again when the bus was near Marana.  (*Id.* at 34, 62 (Tuccino Depo. at 130:2–7, 244:3–5).)  Tuccino was a couple of feet away from Mr. Washburn as he observed him through the plexiglass barrier.  (*Id.* at 36 (Tuccino Depo. at 137:2–6).)

At some time when the bus was near Tucson, the other prisoners assisted Mr. Washburn onto the floor of the bus and insisted that he needed to get off of the bus.  (Doc. *Id.* at 31 (Tuccino Depo. at 118:21–119:4).)  At some unspecified point during the transport, Defendant Tuccino questioned whether Mr. Washburn was faking, so Ballantyne did a "really hard" sternal rub, but Mr. Washburn did not respond.  (Doc. 173 ¶ 78.)  When Defendant Tuccino observed this, he responded, "Well, whatever.  Whatever happens.  We're going.  We're going all the way to Tucson."  (*Id.* ¶ 79.)

Defendant Tuccino called Defendant Gallardo again and relayed what was happening with Mr. Washburn; Tuccino informed Gallardo that "this doesn't look too

good," and Gallardo advised Tuccino to "[k]eep coming." (Doc. 159-2 at 34 (Tuccino Depo. at 130:5–12).)

Thereafter, Defendant Tuccino received a call from second-level supervisor Lieutenant Baker, and Tuccino informed Baker of what was happening with Mr. Washburn. (*Id.* (Tuccino Depo. at 130:18–25).) Baker asked Tuccino if he had initiated an ICS, and Tuccino responded that he was told not to; Baker instructed Tuccino to initiate an ICS, and Tuccino called DC Central to initiate the ICS and report what was happening. (*Id.* (Tuccino Depo. at 131:13–132:4).)

One of the prisoners attempted to help Mr. Washburn by pouring water on him; the prisoners also asked for a CPR mask but Defendant Tuccino did not give them one because "[i]nmates are not allowed to render aid to other inmates." (*Id.* at 36 (Tuccino Depo. at 138:1–139:11).) During one of their phone calls, Tuccino asked Defendant Gallardo, "if this goes really south, what do we do?" and Gallardo respond to "[j]ust keep coming." (*Id.* at 37 (Tuccino Depo. at 144:1–4).)

A vehicle was dispatched from the Department of Public Safety to escort the bus to ASPC-Tucson, and medical support was waiting at the sally port when the bus arrived. (*Id.* at 37–38 (Tuccino Depo. at 144:19–145:2).) When the bus arrived at ASPC-Tucson at approximately 7:30 p.m., Mr. Washburn was removed from the bus, and the medical team began working on him. (*Id.* at 38 (Tuccino Depo. at 146:25–147:6); Doc. 171 ¶ 28.) CPR was initiated but was unsuccessful, and Mr. Washburn was declared dead by the paramedics. (Doc. 161 ¶ 23.)

During the relevant time, Mr. Washburn was being treated for mental illness and was being prescribed psychotropic medications. (Doc. 164 ¶ 4.) Defendants King and Tuccino were never informed that Mr. Washburn's medications made him particularly susceptible to heat-related illness (Doc. 159 ¶ 4; Doc. 159-2 at 52 (Tuccino Depo. at 201:24–202:11.) King and Tuccino did not have access to Mr. Washburn's medical records on the bus. (Doc. 159-2 at 52 (Tuccino Depo. at 201:16–23).)

On the evening prior to the transport, Mr. Washburn was administered three prescribed medications for his mental health issues prior to departing from ASPC Kingman: Risperdal (antipsychotic), Cogentin (used to treat involuntary movements caused by antipsychotic medications), and Prozac (anti-depressant).  (Doc. 164 ¶ 5.)  The Pima County Medical Examiner concluded that Mr. Washburn died from heatstroke and that the administration of various psychotropic medications was a contributing factor. (Doc. 159 ¶ 3.)  Mr. Washburn's toxicology report revealed that he had Cogentin and Prozac in his system at the time of death, but not Risperdal.  (Doc. 162 ¶ 5; Doc. 164 ¶ 6.) Plaintiff's forensic pathology expert, Daniel Spitz, M.D., opined that due to the short half-life of Risperdal and the fact that Mr. Washburn was pronounced dead more than 24 hours after his last dose, "it is likely that the concentration of the Risperdal at the time of Mr. Washburn's death was below the reporting limit for the drug."  (Doc. 180 ¶ 47.)

Plaintiff has disclosed Registered Nurse (RN) Lori Milus as the nursing standard of care expert to testify that when transporting a patient taking Risperdal, Cogentin and Prozac:

> The responsible nurse at the sending facility [should] communicate to the drivers that the patient they are transporting is more susceptible to heat-related illness than other inmates" and that "[a]lthough there was a continuity of care form completed, there is no charting that the information was provided to the transporting officers.

(Doc. 164 ¶ 15.)

## IV.   Eighth Amendment Medical Care Claims

### A.   Legal Standard

To succeed on a § 1983 medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard."  *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  To act with deliberate indifference, a prison official must both

know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

### B. Deliberate Indifference Analysis

#### 1. Objective Prong

The parties do not appear to dispute that Mr. Washburn had a serious medical need, and the record shows that he died from heatstroke and that his prescription medications were a contributing factor. Thus, there is a genuine issue of fact whether Mr. Washburn's medical issue constituted a serious medical need, and the Court must next consider whether

1   Defendants' responses to Mr. Washburn's serious medical need amounted to deliberate
2   indifference.

3                          **2.      Defendants King, Tuccino, and Gallardo**

4           On this record, the facts do not support an Eighth Amendment claim against
5   Defendant Gallardo.  It is undisputed that Defendant Gallardo was not present on the bus
6   during the June 20, 2017 transport.   Moreover, Defendant Gallardo only had the
7   secondhand information relayed to him by Defendant Tuccino to rely on in ascertaining
8   the situation.   Specifically, Defendant Gallardo was informed that Mr. Washburn had
9   vomited and that the other prisoners believed Mr. Washburn had a seizure, which was not
10  confirmed by Defendant Tuccino.   Based on what he heard from Defendant Tuccino,
11  Defendant Gallardo called Nurse Salazar who consulted with NP Easley, and they advised
12  Defendant Gallardo that Mr. Washburn was probably suffering from dehydration and to
13  bring him to ASPC-Tucson for treatment.  Defendant Gallardo's decision not to divert the
14  prison bus to another facility or to activate an ICS did not amount to deliberate indifference
15  where he was following the advice of the trained medical staff, and he was not aware of
16  Mr. Washburn's particular susceptibility to heat-related illness.  Defendant Gallardo is not
17  a trained medical professional, and it was not unreasonable for him to rely on the decisions
18  of the trained prison medical staff.  Based on the limited information he had regarding Mr.
19  Washburn's condition, Defendant Gallardo's decision to consult the medical staff and to
20  follow their advice did not amount to a deliberate disregard to Mr. Washburn's serious
21  medical need.  Accordingly, the Eighth Amendment claim against Defendant Gallardo will
22  be dismissed.

23          Likewise, Defendant King was driving the prison bus when Mr. Washburn began
24  exhibiting actual medical symptoms.   Contrary to Plaintiff's argument, Mr. Washburn
25  pacing the aisles, acting agitated, and pulling at his restraints is not sufficient evidence that
26  he was experiencing a medical emergency at the time he was displaying those behaviors.
27  By the time Mr. Washburn vomited for the first time, Defendant King, who was also
28  unaware of Mr. Washburn's medical history or increased sensitivity to heat, was behind

the wheel of the prison bus and unable to observe Mr. Washburn's condition. As the driver, once the bus left Wickenburg, Defendant King's interactions with the prisoners was limited, and like Defendant Gallardo, he only had the information relayed to him by Defendant Tuccino or that he overheard while Defendant Tuccino was on the phone to rely on. The available facts do not show that Defendant King was aware of a significant risk to Mr. Washburn's health or safety and disregarded that risk. Instead, the evidence shows that Defendant King continued driving the bus all the way to Tucson based on instructions that Defendant Tuccino had received from Defendant Gallardo, who in turn had consulted with the Tucson medical staff. There is no evidence that as a CO II, Defendant King could have made the unilateral decision to divert the bus to a different facility. These facts do not support a finding that Defendant King's limited involvement in the actual medical emergency amounted to a constitutional deprivation. Accordingly, the Eighth Amendment claim against Defendant King will also be dismissed.

Lastly, the Eighth Amendment claim against Defendant Tuccino also fails because his response to Mr. Washburn's serious medical need did not amount to deliberate indifference. Construing the facts in Plaintiff's favor, the other prisoners told Defendant Tuccino that Mr. Washburn had a seizure and repeatedly asked him to call an ambulance for Mr. Washburn. Upon hearing these reports from the prisoners, Defendant Tuccino called his supervisor, Defendant Gallardo, to report the situation and get advice on how to proceed. In other words, he did what most people would do when a difficult or unfamiliar situation arises at work: he called his boss for help. Such a response was not unreasonable. Defendant Tuccino did not personally observe Mr. Washburn having a seizure, and even so, he made his direct supervisor aware of the situation and awaited instructions. Upon learning that Defendant Gallardo had consulted the medical staff, who advised that the bus should continue to Tucson, Defendant Tuccino acted according to the instructions from his supervisor and the medical staff. Defendant Tuccino was not aware of Mr. Washburn's susceptibility to heat-related illness, and other than his basic first aid training, Defendant Tuccino was not a trained medical, and there is no evidence that he was trained or qualified

1   to treat someone suffering from heatstroke.  When Defendant Tuccino witnessed Mr.

2   Washburn vomit and learned that he may have had a seizure, Defendant Tuccino reported

3   this information up the chain of command and ultimately followed the advice handed down

4   his immediate supervisor, via the qualified medical staff.  There is no evidence that

5   Defendant Tuccino had the authority to make a unilateral decision to divert the bus to

6   another prison facility.  Moreover, even if department policy required an ICS to be

7   activated during a medical emergency, a failure to follow an internal policy does not rise

8   to an Eighth Amendment violation.  *See Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir.

9   2009) (alleged failure to follow prison policy does not establish federal constitutional

10  violation); *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997) ("there is no § 1983

11  liability for violating prison policy.  [The plaintiff] must prove that [the official] violated

12  his constitutional right").  Once Lieutenant Baker, the second-level supervisor, instructed

13  Defendant Tuccino to initiate an ICS, Defendant Tuccino complied with the instruction.

14  Defendant Tuccino's decision to follow the instructions of his supervisor and the medical

15  staff over the requests of the prisoners did not amount to a constitutional violation.  On

16  these facts, the actions Defendant Tuccino took in response to witnessing Mr. Washburn's

17  symptoms, did not constitute deliberate indifference.

18          The record shows that the prison bus took approximately 6.5 hours to get from

19  Kingman to Tucson, which included stops in Wikieup and Wickenburg.  The record also

20  indicates that Mr. Washburn began displaying symptoms in Wickenburg when the bus was

21  approximately 2.5 to 3 hours from Tucson.  While he was on the bus, Mr. Washburn had

22  access to water, the windows were open, and the air conditioner was blowing, though not

23  as cool as it had been earlier in the day.  In hindsight, Defendants King, Tuccino, and

24  Gallardo may not have pursued the best course of action available to them at the time, and

25  maybe Mr. Washburn would have had a better chance of surviving if either one of them

26  had made an executive decision to initiate an ICS sooner or divert to a closer prison facility.

27  However, Defendants had no way of knowing how long it would have taken for emergency

28  services to reach the prison bus or what medical services would have been available to Mr.

Washburn at the Perryville facility if the bus had been diverted.  Defendants were faced with several options for responding to Mr. Washburn's conditions, and unfortunately, the course of action that was chosen was unable to save Mr. Washburn's life.  But in this situation, where the incident was promptly reported to a supervisor, the medical staff was consulted, and the medical staff's advice was followed, Defendants' inability to predict which course of action would lead to the best outcome amounted to negligence at most and does not support an Eighth Amendment violation.  On this record, the facts do not support a finding that Defendants King, Tuccino, and Gallardo deliberately disregarded Mr. Washburn's serious medical need.

### 3.     Defendant Corizon

There is no respondeat superior liability against an entity like Corizon under § 1983, and therefore, to succeed on a § 1983 claim against a private entity serving a traditional public function, such as Corizon, Plaintiff must show that Mr. Washburn: (1) suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury.  *Monell v.  New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691-94 (1978); *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138-39 (9th Cir. 2012).  Further, if the policy or custom in question is an unwritten one, the plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice.  *Monell*, 436 U.S. at 691 (*quoting Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)).

As to the first prong of the *Monell* analysis, Plaintiff claims that Nurse Salazar and NP Easley violated Mr. Washburn's Eighth Amendment rights by being deliberately indifferent to his serious medical need.  The record shows that on the day of the transport, Salazar received a call from Defendant Gallardo at approximately 5:00 p.m. and was informed that Mr. Washburn had vomited and was not feeling well.  Defendant Tuccino had previously informed Defendant Gallardo that he had not witnessed Mr. Washburn having a seizure or any signs of a seizure.  Therefore, Defendant Gallardo did not mention

a seizure to Salazar during their phone call.  Salazar consulted with Easley, the on-duty provider, and relayed the information that a prisoner on the transport bus had vomited and was feeling ill, and together they concluded that Mr. Washburn was likely suffering from dehydration and that he should be admitted to the medical unit upon arriving to ASPC-Tucson so that he could be placed on intravenous fluids.  At this point, the prison bus was approximately 2.5 hours from the prison.

On these facts, Salazar and Easley did not act with deliberate indifference.  The decision to treat Mr. Washburn in Tucson instead of having him diverted to another facility was based on the limited information that was available, i.e., that Mr. Washburn had vomited and was not feeling well.  Their assessment of dehydration was not medically unacceptable based on this limited information, and without the ability to physically examine Mr. Washburn in person at that time, they determined that Mr. Washburn's dehydration could be successfully treated at the ASPC-Tucson and made arrangements for his reception at the medical unit.  These facts do not support that Salazar and Easley disregarded Mr. Washburn's serious medical need.  Therefore, the first *Monell* requirement has not been satisfied.

With respect to the second prong of the *Monell* analysis, Plaintiff alleges for the first time in their response to Defendant Corizon's Motion for Summary Judgment that Corizon promulgated two unconstitutional policies: (1) failing to implement training policies to guide nursing staff on how to respond to medical issues that arise during transports and that Corizon; and (2) using an electronic medical record system that could not communicate with the system at privately-run prisons.  (Doc. 169 at 10.)  Plaintiff did not present any of these allegations in her FAC, and the deadline to join parties and amend pleadings expired in September 2019.  (*See* Doc. 35.)  In the Count Four deliberate indifference claim against Corizon, Plaintiff alleged, in relevant part:

> 127. Corizon is a for-profit private corporation that contracts with the State of Arizona / Arizona Department of Corrections to provide medical, dental, and mental health care to inmates in the custody of ADC.

128. As a for-profit private corporation, Corizon has a financial incentive to delay and/or deny inmates access to outside medical care.

129. Corizon is a state actor as that term is used in the jurisprudence of federal civil rights law, 42 U.S.C. § 1983.

130. As set forth in this Count and through this Complaint, Corizon was deliberately indifferent to the serious medical need of Monnie Washburn, an inmate in the custody of ADC.

131. The serious medical need was identified to Corizon at or before 5:03 p.m. on June 20, 2017, when Corizon was notified that Mr. Washburn was suffering from vomiting and severe dehydration, which is an urgent/emergent medical requiring treatment by an appropriate medical provider.

132. Rather than divert the transport to an appropriate health care provider, Corizon advised officers to continue to transport Mr. Washburn to ASPC-Tucson.

133. Deliberate indifference to Mr. Washburn's serious medical need is demonstrated by Corizon's failure to advise officers to access urgent and/or emergent medical care.

(Doc. 1-3 ¶¶ 127–34.)  Federal Rule of Civil Procedure 8(a)(2) requires that the allegations in the complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quotation omitted).

Here, the allegations in the FAC, as listed above, did not provide Corizon any notice concerning the grounds upon which a *Monell* policy claim would be based.  Rather, Plaintiff made it clear in the FAC that their § 1983 claim in Count Four against Corizon was based on Nurse Salazar and NP Easley's actions.  (*See* Doc. 1-3 ¶¶ 127–34.)  There is no mention of the failure-to-train and electronic records policy allegations that were presented for the first time in Plaintiff's summary judgment response.  In fact, Plaintiff did not present any allegations regarding unconstitutional policies promulgated by Corizon in the FAC that would support a *Monell* claim.  (*See id.*)  On a motion for summary judgment, the plaintiff's allegations and theories of liability are confined to those found in the operative complaint, and therefore, based on the foregoing, the Court will not consider new

1    claims raised for the first time in response to a summary judgment motion.  *See Coleman*

2    *v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000); *see also Pickern v. Pier 1 Imps.*

3    *(U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (refusing to allow the plaintiff to assert

4    new specific factual allegations in support of a claim when they were "presented for the

5    first time in [the plaintiff's] opposition to summary judgment").

6           Additionally, even if the Court considered Plaintiff's policy allegations, the record

7    does not support a finding that Corizon failed to maintain an appropriate training policy to

8    guide nurses on how to respond to medical issues that arise during transport.  To succeed

9    on a *Monell* claim, a plaintiff must show that the challenged action is the "standard

10   operating procedure" of the entity.  *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008)

11   (internal quotation omitted).  "Liability for improper custom may not be predicated on

12   isolated or sporadic incidents; it must be founded upon practices of sufficient duration,

13   frequency and consistency that the conduct has become a traditional method of carrying

14   out policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  Here, Nurse Salazar

15   testified that she was not trained in responding to medical issues during transport, and NP

16   Easley testified that he was uncertain whether he was authorized to divert a prison bus to

17   another facility.  This evidence only shows that one Corizon employee, Nurse Salazar, did

18   not receive the training at issue and that NP Easley was uncertain about the extent of his

19   authority.  Likewise, William Carr's testimony only showed that he was unfamiliar with

20   the particular training policies that were in place.  These facts are insufficient to show that

21   a widespread policy or custom of inadequate training existed.

22          Finally, assuming Corizon had a policy of using a medical record system that could

23   not communicate with the record systems at privately-run prisons, the record does not show

24   that the inability to share records between the ASPC-Kingman and ASPC-Tucson facilities

25   is what led to Mr. Washburn's injury.  To be the "moving force" behind a constitutional

26   injury, the "identified deficiency" in the entity's policy must be found to be "closely related

27   to the ultimate injury."  *Gibson v. County of Washoe*, 290 F.3d 1175, 1196 (9th Cir. 2002)

28   (citation omitted).  The plaintiff must show that had the policy or practice been different,

the injury would have been avoided.  *Id.*  In the instant case, even if the ASPC-Kingman and ASPC-Tucson record systems had been able to communicate, Defendants Tuccino and King still would not have had access to Mr. Washburn's medical records prior to departing Kingman and during the transport to Tucson, so they still would not have been aware of Mr. Washburn's increased risk for hyperthermia.  Moreover, it is purely speculative that Nurse Salazar and NP Easley would have responded differently if they had access to Mr. Washburn's ASPC-Kingman records.

Based on the foregoing, the *Monell* claim against Corizon fails, and the Eighth Amendment claim against it will be dismissed.

**V.      State Law Claims**

Under 28 U.S.C. § 1367(c)(3), if a federal district court has dismissed all claims over which it has original jurisdiction, it may, in its discretion, dismiss without prejudice supplemental state-law claims brought in the same action.  Although a district court is not required to dismiss the supplemental state law claims, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, fairness, convenience, and comity— will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 509 (9th Cir. 1989).

Because the Court is granting summary judgment to Defendants on Plaintiff's § 1983 claims, Plaintiff's sole remaining claims in this action are her state law negligence claims in Counts One and Two and survival action in Count Five, over which this Court does not have original jurisdiction.  Based on the Court's review, adjudication of these claims will require detailed analyses of Arizona law to determine which, if any, state law torts arise under the facts herein presented and whether the record contains sufficient evidence to show or create a triable issue of fact as to each of the required elements of each of these claims.  As such, Plaintiff's state law claims are more properly addressed by the Arizona courts, which are charged with administering the laws of Arizona and are more

familiar with state law claims.  The balance of factors therefore tilts strongly in favor of declining to exercise supplemental jurisdiction because state law claims are "best resolved by state courts."  *Salman v. City of Phoenix*, No. CV 11-00646-PHX-FJM, 2011 WL 5024263, at *4 (D. Ariz. Oct. 21, 2011).  Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and will remand those claims back to the Maricopa County Superior Court for further proceedings.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendants' Motions for Summary Judgment (Doc. 157, 158, 160, 163).

(2)     Defendants King and Tuccino's Motion for Summary Judgment (Doc. 157) is **granted**, and Defendants King and Tuccino are **dismissed with prejudice**.

(3)     Defendant Gallardo's Motion for Summary Judgment (Doc. 158) is **granted**, and Defendant Gallardo is **dismissed with prejudice**.

(4)     Defendant Corizon's Motion for Summary Judgment (Doc. 160) is **granted in part** as to Plaintiff's § 1983 claim against Corizon in Count Four, and **denied in part** as to Plaintiff's remaining state law claims against Corizon in Counts One, Two, and Five.

(5)     Counts Three and Four of the Complaint are **dismissed with prejudice**.

(6)     There being no federal claims remaining, Defendants Correct Care and GEO Group's Motion for Summary Judgment (Doc. 163) is **denied as moot** because the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

(7)     This matter is remanded back to the Maricopa County Superior Court to address Plaintiff's remaining state law claims against Defendants Corizon, State of Arizona, GEO Group, and Correct Care.

(8)     The Clerk of Court must mail a certified copy of this Order to:

Jeff Fine
Clerk of the Superior Court
Maricopa County, Arizona Superior Court
201 West Jefferson
Phoenix, Arizona 85003-2205

1        (9)    The Clerk of Court must terminate this action and enter judgment

2   accordingly.

3        Dated this 12th day of August, 2021.

 

 

 

 

 

Douglas L. Rayes
United States District Judge